CITIZENS ACTIVE IN SAN ANTONIO (C.A.S.A.) and Amil M. Baker, Jr., Appellants,

v.

BOARD OF ADJUSTMENT OF the CITY OF SAN ANTONIO, Texas, and George Vann, Director of Building and Zoning for the City of San Antonio, Texas, Appellees.

No. 16541.

Court of Appeals of Texas, San Antonio.

April 13, 1983.

Marion T. Carson and Eugene H. Liech, San Antonio, for appellants.

Jake Talley, Jr., Asst. City Atty., Harvey L. Hardy, San Antonio, for appellees.

Before CADENA, C.J., and REEVES and TIJERINA, JJ.

## OPINION

CADENA, Chief Justice.

Appellant, Citizens Active in San Antonio, sought review by certiorari in the district court of an order of appellee, Board of Adjustment of the City of San Antonio, upholding the issuance of a building permit by appellee, George Vann, director of building and zoning of San Antonio, to appellee, Lee-Jackson-Turner, Inc. The trial court, following a trial to the court, rendered judgment upholding the action of the Board. We affirm.

The facts are undisputed. Lee-Turner-Jackson, Inc., owner of a six-acre tract of land, obtained approval from City's planning commission of a plat of such tract as a single plot. The land in question is zoned "B–2", a classification designed for land and structures occupied by or suitable for "furnishing retail goods, such as groceries, drugs and such services as shoe repairing, to satisfy the household needs of surrounding residential areas." Regulations applicable to B–2 districts are designed to permit the development of the districts for their stated purposes and to protect the surrounding residential areas by requiring compliance with minimum yard standards. Multi-family dwellings are permitted in a B–2 district.

City issued to Lee-Jackson-Turner, Inc., building permits for a group of 33 buildings on the plot in question. Each building contained separate living units for two families. A building permit was also issued for the construction on the plot of a "community building."

This case does not involve application of the substantial evidence rule. The

disposition of this case rests on the interpretation which is to be given the definition of "dwelling, multi-family" which is found in the zoning ordinance. If the project comes within such definition, the building permits were properly issued.

In order to perform its functions, the Board of Adjustment must, at times, interpret the provisions of the zoning ordinance. The interpretation of the ordinance is a question of law, and the courts, in reviewing the decision of the Board, are not bound by the interpretation adopted by that body. *See Board of Adjustment v. Underwood*, 332 S.W.2d 583, 585 (Tex.Civ.App.—San Antonio 1960, writ ref'd n.r.e.).

The ordinance defines "dwelling, multi-family" as "a dwelling or group of dwellings on one plot containing separate living units for three or more families, but which may have joint services or facilities."

Appellant argues that the ordinance requires that each structure, in order to qualify as a multi-family dwelling, must contain three or more separate living units. Appellees contend that since a multi-family dwelling may consist of "a group of dwellings on one plot containing separate living units for three or more families" the project in question comes within the definition found in the ordinance because the 33 structures are all on one plot and, taken together, contain separate living units for 66 families. The Board and the trial court agreed with appellees. So do we.

■ The ordinance contains no definition of "dwelling". However, the word, in its ordinary meaning, refers to a building used for human habitation, without regard to the number of units in a particular building. The term is broad enough to include multi-family dwellings and apartment houses. Annot., 94 A.L.R.2d 419, 426–27 (1964).

■ The zoning ordinance contains separate definitions of multi-family dwellings and apartments. It defines an "apartment house" as "a multi-family dwelling containing three or more family units within a single structure where the families live independently as separate housekeeping units which contain separate facilities for food preparation."

The two separate definitions tend to create a problem. It appears that all apartment houses are, by definition, "multi-family dwellings", but a multi-family dwelling is not necessarily an apartment, since the definition of the latter term contains no requirement that the three or more living units be contained within a single structure.[1] The problem is not made less complex by the fact that the ordinance defines a "two-family attached dwelling" as "two dwelling units with a common wall between the units and under single ownership which may be attached by a common wall to other units," and does not permit two-family attached dwellings in the B–2 district.

The problem can be resolved by making the definitions of "apartment house" and "two-family attached dwelling" applicable only to situations where there is only one structure on each lot, while the definition of "multi-family dwelling is applicable to situations where there is more than one building on the lot in question." Such a definition at least resolves the apparent conflicts created by the definitions of "multi-family dwelling", "apartment house" and "two-family attached dwelling". Some difficulties remain, since under the ordinance, a two-family attached dwelling may be attached by a common wall "to other units", creating a situation which results in three dwelling units within the same structure. This, under the ordinance, would make the structure an apartment house.

If, as appellant contends, there cannot be a multi-family dwelling unit unless each structure contains at least three living

---

1. Appellees suggest that the reason for the two definitions is found in the fact that the zoning ordinance, as amended in 1965, kept in force the zoning classifications existing prior to such amendment, including an "apartment zone" which was part of the pre-1965 ordinance. In the "apartment zone", the old ordinance permitted, among other things, "multiple dwellings, apartment houses or group houses (not including tourist or trailer camps, courts, or lodges)."

units, then the definition of a multi-family unit would be the same as the definition of an apartment house, and one of the definitions would be superfluous. The definition of "apartment house" makes it clear that when the municipal legislative body intended that the three or more dwelling units be "within a single structure" it had no difficulty in expressing such intention. Not only does the definition of multi-family dwelling omit the requirement that the three or more living units be contained within a single structure, it is couched in terms of "a dwelling or group or dwellings." The difference in terminology must be given effect.

The fact that the project is known as "Rozell Apartment Subdivision" and that the building permits refer to "apartments" cannot affect the outcome of this case. It is obvious that none of the 33 structures is an apartment house, nor can the aggregate be regarded as an apartment house under the definition of "apartment" house found in the ordinance.

While the case does not involve zoning or the interpretation of a definition contained in such ordinance, our holding finds at least some support from the holding in *Steilberg v. Lackner,* 69 Cal.App.3d 780, 138 Cal.Rptr. 378, 384 (1977), that a "multiple dwelling" may consist of three different structures.

Appellant's complaint that the trial court erred in not making the additional findings of fact and conclusions of law requested by it is without merit. The facts are undisputed, and the findings of fact made by the trial court are sufficient. The trial court filed several "conclusions of law". The only pertinent conclusion is that the project in question is a multi-family dwelling. Such conclusion of law was filed.

The judgment of the trial court is affirmed.